THE ST. LOUIS & SAN FRANCISCO RAILWAY COMPANY
*et al.* v. ULYSSES BRICKER, *by. Joseph Bricker, his
next friend.*

**No. 11,345.**    (59 Pac. 268.)

PRACTICE, SUPREME COURT—*Inconsistent and Contradictory
Findings.* A general verdict, based upon findings which are in-
consistent with each other and contradictory in matters material
to the issues in the case, will be set aside.

Error from Sumner district court; W. T. McBRIDE,
judge.    Opinion filed December 9, 1899.    Reversed.

### STATEMENT.

THE defendant in error recovered a judgment in the
court below for personal injuries sustained while in
the employ of plaintiffs in error in the capacity of
bridge repairer.    He was working in company with
several others, under the direction of D. A. Bower-
sock, foreman, who was superintending the repair of
bridges.    At the time of the accident Bricker was
engaged with the others in the work of removing old
timbers from a bridge over a dry ravine, or gully, and
putting in new timbers.    The railroad and bridge ran
from northeast to southwest.    New timbers were
placed on the ground about 100 feet from the bridge,
convenient for framing and other work.    They were
then loaded on a push-car, taken to the bridge, and
thrown off.    While this was being done the nuts and
bolts holding the old timbers were loosened and the
new timbers substituted for the old.    Plaintiff below
had been engaged at this work for several months
before his injury.    The bridge was thirty-two feet
long and six feet high above the ravine and gully.
Bricker, under the direction of the foreman, went
under the bridge at the southwest end and commenced

digging, in company with another workman named Grimes. The following is a synopsis of the testimony of plaintiff below, showing the cause of the accident:

While Mr. Grimes and I were doing this work the other men were taking some heights on the bridge with a straight-edge and were sawing off piling. There were four men at work about the bridge while I was digging, besides the man who was digging with me, and the foreman. My brother was at the bridge. When I quit digging the other men were not through sawing piling off. Immediately after I quit digging I went to taking off nuts. Bowersock told me to get a wrench and go under the bridge and take off those nuts that held the stringers together. While I was working at taking off the nuts there were five men working around the bridge, besides the foreman and myself. While I was working under the bridge the other men went away, and that was before the push-car came down. I supposed they were going up where the other men were at work. That's the work they had come down there to do — to put those timbers on that bridge. That's what we were all to do. The ordinary way would be to put the timbers on a push-car and bring them down to the bridge. That's the way we usually did in fixing bridges. I supposed they would do the same they had always done. Mr. Bowersock stood right there on the bridge. I noticed were he was.

What is known as the cap is laid crosswise of the track on the piling, then the stringers were laid lengthwise of the track, and then the ties were laid across the stringers. There were two sets of stringers and two sets of bolts on each end of these stringers. The bolts bolted together two pieces of timber that constituted the stringers. · The bolts went through. The nuts were put on the inside of the stringers. I took them off at the middle of the bridge first, and then I went up to the northeast end of the bridge and went to take off the bolts. When the push-car came down I supposed I heard it. I just glanced up. I knew it was the push-car; I supposed it was. I seen the

15—61 KAN.

timbers; I just glanced up. When I looked up and saw the car I knew it was the push-car with timbers 'on it; I supposed it was. I did not look at it very closely, but knew it was passing over me. I had an idea they were going to throw the timbers off. When I saw them pushing them, I understood they were going to throw them off. The car came from the northeast and passed over my head. Bowersock, the foreman, was standing on the bridge. The car passed him. I do not think the car stopped at my end of the bridge. I do not think it stopped until it got to the further end of the bridge. They were going at an ordinary walk. After I looked up and saw them going past I just kept on at my work. I think I heard them roll the log off at the other end. That is my recollection. I think I looked up and saw where it struck. It was the north side. It was the left-hand side as you go towards Ellsworth. When I had looked up and noticed that they had thrown the log off, I just kept on with my work, and then I heard them moving the push-car. They finally stopped about the middle of the bridge. Bowersock was standing at the northeast end of the bridge, toward Ellsworth. I remember seeing him. I looked up and saw his clothing and feet. When I heard the push-car coming and heard it stop, I kept right on at my work. I understood that they were going to roll a stick off. It was not very long after the car stopped, about the middle of the bridge, before Bowersock called out, "Look out!" or "Get out!" I could not say just how long. It was not very long. I ran as fast as I could. I had to come down this way a little to get out, and just as I came out from under there I heard him halloo again. I glanced up, saw the timber coming, jumped to get out of the way, and just as I was coming out it struck my body and crushed me down.

The particular questions of fact were submitted to the jury, which, with the answers thereto, were as follows:

"1. How old was Ulysses Bricker at the time of

the injury complained of?   Ans. Nineteen years of age.

"2.  Was the injury complained of occasioned by any particular act of negligence on the part of any servants or employees of the defendant?   A. Yes.

"3.  If you answer question 2 in the affirmative, state which one of those servants or employees was guilty of such negligence, and state fully what such negligence consisted of.   A.  Dave Bowersock — did not give proper warning of danger.

"4.  Did Dave Bowersock, foreman of the bridge gang, call to Bricker before the stock of timber was rolled off the hand-car?   A.  Yes; but not in time to prevent the misfortune.

"5.  Did defendant's servants and employees use ordinary care and do what ordinary prudent men would do under like circumstances?   A.  No.

"6.  If you answer question 5 in the negative, state what they should have done that they failed to do. A.  They should have given timely warning.

"7.  Did Bricker know that his coemployees were at work above him on the bridge, and that they were about to unload a stick of timber?   A.  Yes."

"9.  Was there anything to prevent Bricker from going out from under the bridge at the opposite side from where he did go out?   A.  No evidence."

"11.  If Bricker had gone out from under the bridge at the other side from where he did go out, would the injury complained of have occurred?   A.  No.

"12.  How long had Bricker been at bridge work? A.  Eight months.

"13.  Was Bricker a man of ordinary intelligence? A.  Yes.

"14.  Was Bricker old enough to know and comprehend the danger surrounding the work at which he was employed.   A.  Yes.

"15.  Could Bricker see the men at work on the top of the bridge under which he was at work?   A.  He could see them when they were above him."

"20.  State fully what negligence you find defendant's servants and employees were guilty of, if any,

which was the direct cause of the injury complained of.    A.  The foreman did not give timely warning to Ulysses Bricker nor inform the men who were unloading the timber that there was any one under the bridge at work.

"21.  Did defendant's servants and employees use ordinary care and caution in unloading said stick of timber?  A.  No.

"22.  Could Bricker have avoided the injury complained of had he remained where he was at work and watched which side said stick of timber was about to fall?  A.  Yes."

"25.  If you find for the plaintiff, how much do you allow him for loss of time by reason of the direct result of the injury complained of?  A.  $1793.

"26.  If you find for the plaintiff, how much do you allow him for mental anguish?  A.  Nothing."

"29.  If you find for the plaintiff, how much do you allow him for pain and suffering up to this time?  A. $1000.

"30.  If you find for the plaintiff, how much do you allow him for the pain he may suffer in the future? A.  Nothing.

"31.  If you find for the plaintiff, how much do you allow him for permanent injuries?  A.  $3000.

"32.  If you find for the plaintiff, how much do you allow him for loss of ability to earn a livelihood?  A. $1207."

"34.  How long was the bridge under which Bricker was working?  A.  Thirty-two feet.

"35.  How high was it under the bridge at the point where Bricker was at work?  A.  About two and one-half feet.

"36.  How high was said bridge at the center at the point where Bricker went out from under it?  A. Six feet to base of rail at center.

"37.  How long was the push-car on which the stick of timber was loaded?  A.  Five feet long.

"38.  How wide was the push-car on which the stick of timber was loaded?  A.  Four and a half feet wide.

"39. Under what part of the bridge was Bricker at work when Bowersock called to him? A. Under the northeast end.

"40. At what point on the bridge was the push-car at the time the stick of timber was rolled off of it? A. Near the center.

"41. How long was the stick of timber that plaintiff claims struck him? A. Twelve feet long."

*J. W. Gleed, John L. Hunt, Gleed, Ware & Gleed, E. F. Ware, and D. E. Palmer,* for plaintiffs in error.

*J. D. Houston,* and *C. R. Mitchell,* for defendant in error.

The opinion of the court was delivered by

Smith, J.: The findings of the jury being inconsistent with one another, the verdict cannot stand. It is found that the direct cause of the injury was the failure of the foreman in charge of the bridge repairers to give timely warning to the defendant in error, and neglect of the foreman to inform the men who were unloading the timbers that there was any one under the bridge at work. It is also found that defendant in error knew that his coemployees were at work above him, and that they were about to throw off a stick of timber. This, coupled with the finding that Bricker could have avoided the injury complained of had he remained where he was at work and watched which side of the bridge the stick of timber was about to fall, tends to the conclusion that the defendant in error was guilty of contributory negligence, and that his own want of care, and not that of the foreman, caused the injury. While want of ordinary care on the part of the foreman is expressly found in at least six of the answers to particular questions, yet a strong showing of contributory negligence on the part of plaintiff below appears in three other answers.

The inconsistency between these different findings is so palpable and clear as to render them irreconcilable. In one answer the jury say that plaintiff below had no timely warning of danger, and in another that his situation and information were such that he needed none — in effect, saying that a warning would not contribute to the knowledge he already possessed of his dangerous position. The general verdict, based on such findings, must be set aside. ( *Shoemaker v. St. L. & S. F. Rly. Co.*, 30 Kan. 359, 2 Pac. 517; *A. T. & S. F. Rld. Co. v. Weber, Adm'r*, 33 id. 543, 6 Pac. 877; *A. T. & S. F. Rld. Co. v. Maher*, 23 id. 163.)

The judgment of the court below will be reversed, and a new trial ordered.